UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x
LESLIE PORTO,

Plaintiff,

COMPLAINT

- against -

PLAINTIFF DEMANDS A TRIAL BY JURY

LEVEL 3 COMMUNICATIONS, LLC;
CENTURYLINK COMMUNICATIONS, LLC; and
TERRY DONAHUE

Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

Plaintiff Leslie Porto ("Plaintiff"), by her attorneys, Vladeck, Raskin & Clark, P.C., complaining of Level 3 Communications, LLC ("Level 3"), CenturyLink Communications, LLC ("CenturyLink"), and Terry Donahue (collectively "Defendants"), alleges as follows:

NATURE OF CLAIMS

1. In February 2014, Porto began working for Level 3 (now CenturyLink), a communications company, as a sales consultant. Shortly thereafter, she became the victim of sexual harassment by Terry Donahue, her immediate supervisor. Donahue, who would discuss sex-related topics at work, groped one of Porto's friends at a work gathering; boasted that one of Porto's female colleagues was "big and voluptuous"; and stated to a group of Porto's male co-workers, "I don't know how a guy's dick can get hard when she [Porto] never shuts her mouth." When Porto confronted Donahue about his behavior, he was dismissive or merely laughed. He also began to retaliate against Porto. He ridiculed her in front of coworkers, stripped of her responsibilities, and ultimately, tried to force her out of the company. Porto eventually complained to Human Resources. However, the retaliation continued, including, most recently,



896423 v1

the Company's threat to withhold Porto's earned commissions unless she agreed to waive her right to a jury trial.

2. Porto brings this action to remedy these violations of the New York State Human Rights Law, N.Y. Executive Law § 290 et seq. (the "NYSHRL") and the New York City Human Rights Law, Administrative Code of the City of New York § 8-107 et seq. (the "NYCHRL").

## PARTIES

3. Porto resides and is domiciled in New York. Porto was hired by Level 3 as a Solutions Consultant in February 2014. In this role, Porto's responsibilities included supporting the sales teams and promoting cross product sales to existing customers. Porto's position was based in Level 3's New York City offices.

4. Donahue, a Director of Solutions Consulting, resides and is domiciled in Pennsylvania.

5. Level 3 was a multinational telecommunications company that provided a range of integrated telecommunications services to enterprise, government and carrier customers.

6. Level 3 was incorporated under the laws of Delaware and had a principle place of business in Colorado. Level 3 maintained offices in Manhattan and is registered as a foreign limited liability company with the New York State Department of State.

7. In or around November 2017, CenturyLink completed an acquisition of Level 3.

8. CenturyLink is a multinational telecommunications company in the same line of business at Level 3 that is incorporated under the laws of Delaware and has a principal place of business in Louisiana.

9. Following CenturyLink's acquisition of Level 3, Porto remained in the same position she had a Level 3. Porto's location of employment, general responsibilities, and immediate supervisory structure did not change because of the acquisition.

## JURISDICTION AND VENUE

10. The Court has jurisdiction over Plaintiff's NYSHRL and NYCHRL claims under 28 U.S.C. § 1332 because there is complete diversity of citizenship between the parties and damages exceeding $75,000 in value.

11. Venue is proper in this District pursuant to 28 U.S.C. § 1391 because the unlawful practices complained of herein occurred within the Southern District of New York.

12. Pursuant to § 8-502(c) of the NYCHRL, Plaintiff caused a copy of the Complaint to be served on the Corporation Counsel of the City of New York and the New York City Commission on Human Rights.

## FACTUAL ALLEGATIONS

### Background

13. Porto is a 58-year-old woman who has had a long and successful career as a sales and operations professional, including more than two decades of experience at Verizon, where she specialized in voice customer services.

14. Based on her expertise in voice and contact center services, Porto was recruited to join Level 3, and she began working for Level 3 as a Solutions Consultant based in the company's New York City offices in February 2014.

15. Porto's immediate supervisor was Donahue, a Director of Solutions Consulting, who is based in Pittsburgh, Pennsylvania, but frequently visited Level 3's New York offices.

16. From 2014 to 2015, Donahue reported to Steve Orlando, Level 3's Regional Vice President for Strategic Accounts, and thereafter to Mark Taylor, Level 3's Vice President of Global Solutions and Engineering.

Donahue's Early Harassment and Offensive Conduct

17. In August 2014, just months after she started employment at Level 3, Porto went on a company trip to Level 3's headquarters in Colorado. Porto was accompanied by her teenaged daughter and a female friend.

18. During a gathering of co-workers in the lobby of the hotel where Level 3 staff were staying, Donahue reached over and groped Porto's friend from behind. Porto and her teenaged daughter were present. Feeling humiliated and embarrassed, Porto's friend immediately returned to her hotel room.

19. The following day, Donahue asked Porto about her friend. Porto confronted Donahue about the sexual assault. Donahue was dismissive and laughed.

20. Undeterred, Donahue continued his sexually harassing behavior and on the trip. In the presence of Porto and several co-workers, he described one of Porto's female co-workers as "big and voluptuous."

21. Donahue's offensive conduct persisted after the trip. The following month, on a business trip in the New York City office, Donahue told three of Porto's male colleagues in Porto's presence, "I don't know how a guy's dick can get hard when [Porto] never shuts her mouth."

22. Porto again confronted Donahue about his harassing behavior. She told Donahue that his statement was improper and insulting. Once again, Donahue was again dismissive and mocked Porto for providing him with "good coaching."

23. Donahue's sexist and/or offensive comments became regular occurrence on the job. On a number of occasions, Donahue discussed with Porto and her coworkers private matters related to sex and inappropriate contact during visits to the New York offices.

Donahue's Continued Harassment and Diminishment of Porto's Responsibilities

24. Just months following the Colorado incident and Porto's entreaty that Donahue cease making sexist comments in the office, Donahue began to diminish Porto's role in the company.

25. Donahue began by disinviting Porto to meetings that she had regularly attended during Porto's early months at Level 3. Information shared at these meetings was of crucial importance for Porto to effectively do her job.

26. On those occasions when Porto was permitted to attend meetings or give presentations to groups, Donahue targeted Porto, scrutinizing her work and conduct more severely than that of her peers.

27. For example, during one particularly upsetting in-person meeting in July 2016, Donahue singled Porto out and chided her for going to the restroom during an extended meeting, despite not doing so to others when they needed to step out.

28. Donahue started to cut Porto off during meetings so that her male colleagues could speak. In one meeting, Donahue humiliated Porto, stating, "You speak to just have something to say."

29. On another occasion, in or about July 2016, Donahue leaned into Porto's cubicle while using his back to block the view of Porto's coworker in the adjoining cubicle. After leaning in, Donahue growled false and disparaging comments at Porto, who at the time was on a

call with an important client. As Donahue was making these comments, the coworker whose view Donahue blocked sent Porto a message to check in about the exchange out of concern.

Porto's Positive Job Performance

30. Notwithstanding Donahue's actions, Porto continued to receive positive feedback regarding her performance.

31. For instance, Bill Wohnoutka, Level 3's Vice President of Security Solutions, referred to Porto in or around December 2015 as a "high potential" employee and praised her for work I did in developing securities opportunities for the sales team.

32. Porto's success with these accounts was also heralded in company-wide communications by Gary Breauninger, Level 3's Group Vice President of the Global Accounts Management Division. In late 2015, Breauninger's Chief of Staff, Andee Barbieri, also positively remarked on contributions Porto made to the company's work, including calling Porto "a rockstar."

33. Porto's success cultivating these accounts was referenced in her positive 2015 performance evaluation.

34. Based on this positive track record, Cliff Dinwiddie, Level 3's Vice President of Sales, Global Accounts Division, praised Porto for being the "ultimate utility player" and asked that she join his leadership team and oversee Level 3's security portfolio for his branch.

Donahue Further Diminishes Porto's Responsibilities

35. Despite Porto's history of strong performance, Donahue continued to both undermine Porto's role in meetings and diminish her work duties and, ultimately, engaged in a campaign to push her out of Level 3 in the winter of 2016.

36. At around this time, in November 2016, Donahue shifted, without explanation, accounts that were originally under Porto's oversight to a male colleague. As a result, she was no longer capable of earning commissions and stripped of almost all her responsibilities, which humiliated her and harmed Porto's reputation among her peer and clients for whom she had been the point person.

37. In what Donahue described as a "man to man agreement," Donahue claimed to have worked out with Carl Orleman for Porto to work under Orleman's supervision. Donahue stated that if Porto wanted to remain at Level 3, she would have to accept this plan. Orleman later told Porto there was no such agreement. This is just one of several misrepresentations Donahue made in relation to Porto finding an alternate role at Level 3.

38. Realizing the Donahue was seeking to limit her options, Porto had begun inquiring into open positions at Level 3 that were not under Donahue's supervision.

39. Porto applied for a position with Level 3's Security Evangelist. Although several senior Level 3 recommended Porto for the position, Donahue managed those hiring for the position and Porto was told afterward that she did not receive the position because she lacked experience in security, a false rationale inconsistent with Porto's role developing business for Level 3's security portfolio since 2014.

40. Porto then asked Donahue whether she could possible work under Dinwiddie. Donahue, however, told Porto, without explanation, that Taylor said it "would not work."

41. Porto's additional efforts to escape included applying to more than five other open positions at Level 3. These efforts, however, proved fruitless. Indeed, at one interview, a female interviewer told Porto that she had been directed to give the position to a younger male employee and told Porto "You know, Leslie; it's a boy's club."

42. An interviewer for a separate position in marketing told Porto that Taylor, with whom Donahue regularly conferred, had "a strange reaction" when informed that Porto wished to take the marketing position.

43. Upon information and belief, Donahue communicated with and discouraged Level 3 employees from hiring Porto for alternate positions at the company.

Porto's Complaints to Human Resources

44. Frustrated by Donahue's sexism and obstruction to her professional advancement, in February 2017, Porto reported Donahue's discrimination, obstructionism, and pattern of sexist comments and harassing conduct to Breauninger, who then in turn directed Porto's complaints to Level 3's Human Resources Department.

45. Adam Ayles, a Level 3 Human Resources representative, started an investigation that resulted in Donahue being reprimanded.

46. Upon information and belief, the investigation uncovered information corroborating Porto's claims.

47. Upon information and belief, Level 3's upper-level management, including Taylor and others with supervisory authority over Donahue, were informed about Porto's complaints and the findings of the investigation.

48. Donahue was not fired, and Donahue was permitted to remain Porto's supervisor until July 2017, throughout the duration of the investigation.

49. Notwithstanding the reprimand, Donahue's retaliatory conduct persisted.

50. In March 2017, shortly after Porto's report to Breauninger and Human Resources' questioning of Donahue, Donahue offered Porto a role focused on "deliverables." The position,

however, still left Porto without the possibility of earning commission payments and with far diminished responsibilities.

51. Donahue asked that Porto commit to a new "role mandate" to formalize this offer. To Porto's knowledge, none of her coworkers had ever previously been asked to enter formal role mandates.

52. In July 2017, after the investigation was concluded, Porto was assigned a position reporting to Joda Schaumberg, a Level 3 Director of Sales Engineering, Strategic Enterprise. The position under Schaumberg, however, still lacked responsibilities equivalent to those Porto had originally and was subject to a less favorable bonus/commission payment structure that was applied retrospectively and caused Porto to forfeit commissions compensation that she had earned in her former role.

53. Neither Level 3 nor CenturyLink has not made any other attempts to cure the effects Donahue's unlawful conduct has had on Porto's prospects for professional advancement.

54. Recently, Defendants sent Porto a proposed agreement concerning payments of commissions, including those earned for the first quarter of 2018. The terms of the agreement that could be viewed absent agreement, provided that Porto would not be entitled to earn any commissions for her work, included those already earned but unpaid, unless she agreed to "waive [her] right to a jury trial."

FIRST CAUSE OF ACTION

Discrimination & Hostile Work Environment Based on Sex under the NYSHRL

55. Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 54 of this Complaint as if set forth herein.

56. By the acts described above, Defendants discriminated against Plaintiff in the terms and conditions of her employment and subjected Plaintiff to a hostile work environment on the basis of her sex in violation of the NYSHRL.

57. As a result of Defendants' discriminatory acts, Plaintiff has suffered and will continue to suffer irreparable injury, emotional distress, and other compensable damage unless and until this Court grants relief.

## SECOND CAUSE OF ACTION

### Retaliation under the NYSHRL

58. Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 57 of this Complaint as if set forth herein.

59. By the acts described above, Defendants retaliated against Plaintiff for engaging in protected activity under the NYSHRL.

60. As a result of Defendants' retaliatory acts, Plaintiff has suffered and will continue to suffer irreparable injury, emotional distress, and other compensable damage unless and until this Court grants relief.

## THIRD CAUSE OF ACTION

### Discrimination & Hostile Work Environment Based on Sex under the NYCHRL

61. Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 60 of this Complaint as if set forth herein.

62. By the acts described above, Defendants discriminated against Plaintiff in the terms and conditions of her employment and subjected Plaintiff to a hostile work environment on the basis of her sex in violation of the NYCHRL.

63. As a result of Defendants' discriminatory acts, Plaintiff has suffered and will continue to suffer irreparable injury, emotional distress, and other compensable damage unless and until this Court grants relief.

FOURTH CAUSE OF ACTION

Retaliation under the NYSHRL

64. Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 63 of this Complaint as if set forth herein.

65. By the acts described above, Defendants retaliated against Plaintiff for engaging in protected activity under the NYCHRL.

66. As a result of Defendants' retaliatory acts, Plaintiff has suffered and will continue to suffer irreparable injury, emotional distress, and other compensable damage unless and until this Court grants relief.

PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court enter a Judgment:

(a) declaring the acts and practices complained of herein to be violations of the NYSHRL and the NYCHRL;

(b) enjoining and permanently restraining these violations of the NYSHRL and the NYCHRL;

(c) directing Defendants to take such affirmative steps as are necessary to ensure that the effects of these unlawful practices are eliminated and do not continue to affect Plaintiff's employment opportunities;

(d) directing Defendants to place Plaintiff in the position she would have occupied but for Defendant's discriminatory and retaliatory treatment of her, and making her whole

for all earnings and other benefits she would have received but for Defendants' discriminatory treatment, including but not limited to wages, including back pay and front pay, bonuses, and other lost benefits;

(e) directing Defendants to pay Plaintiff compensatory damages, including damages for emotional distress, humiliation, pain and suffering, and injury to professional standing and reputation;

(f) directing Defendants to pay Plaintiff additional amounts as punitive damages;

(g) awarding Plaintiff such interest as is allowed by law, and damages for any adverse tax consequences stemming from an award;

(h) awarding Plaintiff the costs of this action, together with reasonable attorneys' fees; and

(i) awarding such other and further relief as this Court deems necessary and proper.

DEMAND FOR TRIAL BY JURY

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff demands a trial by jury in this action.

Dated: New York, New York
March 30, 2018

VLADECK, RASKIN & CLARK, P.C.

By:___________/s___________________

Valdi Licul
Vladeck, Raskin & Clark P.C.
Attorneys for Plaintiff
565 Fifth Avenue, 9th Floor
New York, New York 10017
(212) 403-7300